IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DONNA LOHR, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 1:12CV718 |
| UNITEDHEALTH GROUP INCORPORATED, | ) ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

This suit arises from a dispute between Plaintiff Donna Lohr and Defendant UnitedHealth Group Incorporated ("United") regarding United's denial of Ms. Lohr's claim for short-term disability ("STD") and, consequently, long-term disability ("LTD"). As a result, Ms. Lohr alleges, among other things, a violation of her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").[1] The case is before the Court on Defendant's Motion for Judgment on the Administrative Record (Doc. #27).[2] For the reasons set forth below, Defendant's Motion will be GRANTED.

---

[1] In her Complaint, Ms. Lohr alleged four causes of action, the first of which is an alleged violation of ERISA. The Court previously dismissed the second and third causes of action. (Docs. # 14, 16.) Ms. Lohr voluntarily dismissed with prejudice her fourth cause of action on October 4, 2013. (Doc. #43.)

[2] The Parties stipulated that the alleged ERISA violation would be determined on cross-motions for judgment on the Administrative Record. (See Doc. #18 at 6.) However, Ms. Lohr failed to make such a motion and, instead, only opposed United's motion.

I.

A.

Ms. Lohr worked as a claims representative for United since 2005. (R. at 4.)[3] In that role, she was "responsible for providing expertise of general claims support to teams in reviewing, researching, investigating, negotiating, processing and adjusting claims" and was required to "[p]roactively identify solutions to non-standard requests" and to "solve moderately complex problems." (Id. at 108.) As a benefit of her employment, Ms. Lohr received STD insurance through the UnitedHealth Group Short-Term Disability Plan (the "STD Plan") and LTD insurance through the UnitedHealth Group Long-Term Disability Plan (the "LTD Plan").

Under the terms of the STD Plan, STD benefits are payable beginning "after the Claims Administrator determines that you are Disabled, and you have been Disabled for a period of five consecutive business days (which is also a seven-consecutive-calendar-day period)." (Id. at 101.) The STD benefits would remain payable for a 180-day period thereafter. (Id. at 103.) Under the terms of the LTD Plan, a participant is not eligible to receive LTD benefits unless he or she is "Disabled for each day of a 180-day calendar day period of time that starts on the first day of which [the Claims Administrator] determines that [he or she is] Disabled." (Id. at 113.)

In order for a participant in the STD Plan to be considered Disabled, the following four conditions must be met:

---

[3] The Parties filed the Settled Administrative Record and the Governing Documents of the relevant disability plans under seal. The Settled Administrative Record will be referred to as "R. at ___" and the Governing Documents will be referred to as "Gov. Docs. at ___" in this Memorandum Opinion.

2

- You have been seen face-to-face by a Physician about your Disability within 10 business days of the first day of absence related to the Disability leave of absence;
- Your Physician has provided Medical Evidence that supports your inability to perform the material duties of your Own Occupation;
- You are under the Regular and Appropriate Care of a Physician; and
- Your Medical Condition is not work-related and is a Medically Determinable Impairment.

(Id. at 101; see also id. at 129 (defining "Disabled" under the STD Plan as being "unable to perform with reasonable continuity the Material Duties of your Own Occupation because of a non-work related Medical Condition"). Cf. id. at 112, 129 (defining "Disabled" under the LTD Plan).)

In order to qualify as a "Medically Determinable Impairment" under the fourth requirement, a "physical or mental impairment must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." (Id. at 130.)

Of particular importance here, coverage under the Plans ends on "[t]he 90th day of a leave of absence, paid or unpaid, that is approved by [United] in writing, including Disability leave." (Id. at 100, 110.) In a section entitled "If Your Disability Leave Extends Beyond 90 Days," the Governing Documents further explain:

> If your approved Disability leave of absence extends beyond 90 days, your STD and LTD Plan coverage ends on the 90th day. However, if you are receiving STD Benefits or LTD Benefits at the time your coverage ends, you will continue to be eligible for STD Benefits or LTD Benefits as long as you continue to be Disabled under the provisions of the STD Plan and LTD Plan in effect at the commencement of your Disability.

(Id. at 100.)

Each Plan grants the Claims Administrator "the exclusive right and discretion, with respect to claims and appeals, to interpret the [P]lan's terms,

3

to administer the [P]lan's benefits, to determine the applicable facts and to apply the [P]lan's terms to the facts." (Id. at 144.) For the STD Plan (and during the first 24 months of benefits under the LTD Plan), United delegated this discretionary authority to Sedgwick Claims Management Services, Inc. ("Sedgwick"). (Id. at 96.)

B.

Ms. Lohr commenced leave on February 2, 2011, following a visit with Dr. Kathleen Rice, a family practice physician, on January 31, 2011. (R. at 37.) Dr. Rice completed certain medical documentation with respect to that visit. (See id. at 30-37.) According to that documentation, Dr. Rice observed Ms. Lohr to be well groomed, with normal motor activity and intact thought process, fully oriented, and without hallucinations, delusions, or suicidal ideations but noted her affect to be flat, her mood depressed, and her speech delayed. (Id. at 34-35.) Dr. Rice diagnosed her with depression and anxiety and indicated that she "can't work due to severe anxiety." (Id. at 30, 31; see also id. at 35.) Dr. Rice approximated that Ms. Lohr's condition commenced on May 22, 2008, and had an indefinite probable duration. (Id. at 39.) Furthermore, in observations somewhat in tension with one another, Dr. Rice indicated that Ms. Lohr was not "unable to perform any of [her] job functions due to [her] condition," (id. at 39), but also that she would be "incapacitated for a single continuous period of time due to [her] medical condition," (id. at 40). Dr. Rice noted that Ms. Lohr would be totally disabled from work from January 31, 2011, to March 1, 2011, and provided her estimated return to work date as March 2, 2011. (Id. at 37.)

On February 28, 2011, Ms. Lohr was seen by Barbara Morgan, Ph.D., a nurse practitioner with Piedmont Psychiatric, who also completed certain

4

medical documentation regarding that appointment. (Id. at 44-47.) Dr. Morgan noted that Ms. Lohr's condition commenced in approximately May 2010 and its probable duration was unknown. (Id. at 45.) Unlike Dr. Rice, in response to the query "Is the employee unable to perform any of his/her job functions due to the condition?," Dr. Morgan marked "Yes." (Id.) In response to the subsequent prompt, "If so, identify the job function the employee is unable to perform," Dr. Morgan wrote, "cannot concentrate to perform job." (Id.) In a section reserved for the notation of other relevant medical facts, Dr. Morgan wrote: "Depressed, crying episodes, hives, unable to sleep, anger outbursts, poor appetite, no energy." (Id. at 45.) Dr. Morgan estimated the beginning and end dates of Ms. Lohr's period of incapacity as "start 3/1/11 - ?" and wrote: "At this time its [sic] difficult to estimate any specific return date. It will depend upon response to medication and therapy." (Id. at 46.)

Based on this documentation, on March 18, 2011, Sedgwick informed Ms. Lohr that it had completed a review of her claim for short-term disability benefits and determined that she did not qualify for benefits because "[m]edical documentation from your providers does not provide objective information that would indicate your inability to perform your job duties. There are no observed symptoms provided by your providers." (Id. at 86.) That letter cited the provision of the STD Plan which requires, as a condition of being considered Disabled, that "[y]our physician has provided Medical Evidence that supports your inability to perform the Material Duties of you [sic] Own Occupation," (id. at 86-87), and noted the Plan's definition of Medical Evidence as "clear documentation, provided by your Physician supporting your disability of functional impairments and functional limitations

5

due to a Medically Determinable Impairment that would prevent you from performing the Material Duties of your Own Occupation safely and/or adequately," (id. at 88). The letter further explained:

> Medical Evidence may include but is not limited to objective medical findings that can be observed by your physician. Objective findings may include but are not limited to: physical examination findings (observed functional impairments or incapacity); diagnostic test results; imaging studies, x-ray results; observations of anatomical, physiological, or psychological abnormalities; medications and/or treatment plan. The medical evidence that is provided must clearly demonstrate that you are unable to perform your required job duties, or job duties that are available to you through transitional work.

(Id.)

On June 3, 2011, Ms. Lohr appealed the denial of her claim based on "additional medical information" submitted by her physicians. (Id. at 105-107.) The additional medical information included an April 7, 2011, Mental Health Assessment of Ability to do Work-Related Activities. (Id. at 93-95.) In the Assessment, Dr. Morgan noted that Ms. Lohr's speech and motor activity were normal, that her thought process and judgment were intact, that she was fully oriented and that she did not suffer from hallucinations, delusions, or suicidal ideations. (Id. at 93-94.) However, Dr. Morgan noted Ms. Lohr's affect as sad and her mood as depressed, and commented that "Patient breaks out in hives at night from anxiety; [h]er mind races, sleeps poorly; appetite poor; has no energy; numerous stressors in home." (Id. at 94.) Dr. Morgan marked "No Impairment" for impulse control, memory, ability to regulate and initiate activities, ability to perform well learned tasks, problem solving, reasoning and judgment. (Id. at 94, 97.) Dr. Morgan noted "Patient reports [impairments] but not observed" with respect to concentration, motivation, and ability to interact with others. (Id. at 94, 97.)

6

With respect to emotional regulation, Dr. Morgan marked "Patient reports [impairments] and observed" and elaborated that Ms. Lohr was "[t]earful at times during interview." (Id. at 97.) Dr. Morgan diagnosed her with depression and anxiety, indicated that she would be totally disabled from work from January 31, 2011 to June 30, 2011, and estimated her return to work date as July 1, 2011. (Id. at 93, 98.)

In addition to the Assessment, Ms. Lohr submitted an April 25, 2011, Office Note, in which Dr. Morgan noted:

> Has lost 7 lbs. Mood better. Still has issues. Sleeps about 3 [hours per] night. . . . Still has racing thoughts at night. Daughter moving to Mexico in June. No crying episodes except 1 x. No hives in awhile. Appetite poor. No smoking. One glass of wine at night. Denies [suicidal/homicidal ideations]. Unable to work.

(Id. at 100.)

In connection with Ms. Lohr's appeal, Sedgwick sought an independent physician review of her claim documents and, accordingly, on June 27, 2011, referred her file to Reginald Givens, M.D., Board Certified in psychiatry and neurology. (Id. at 109-110.) Dr. Givens reviewed the documents provided by Dr. Rice and Dr. Morgan that were subject of Sedgwick's initial review, but also reviewed the updated documents, including: 1) the April 7, 2011, Mental Health Assessment of Ability to do Work-Related Activities, (id. at 93-98); and 2) the April 25, 2011, Office Note from Dr. Morgan, (id. at 100).

Dr. Givens also attempted to contact Ms. Lohr's medical providers by telephone, but they did not return his calls. (Id. at 112-13.) He concluded that, "[b]ased on the review of the provided medical information, the employee is not disabled from her regular unrestricted job as of 02/02/11 through return to work." (Id. at 114.) Dr. Givens explained:

7

> There is insufficient objective evidence of cognitive dysfunction that would prevent Donna Lohr from performing occupational duties. No specific testing of cognitive functioning is documented in the records, including the most recent documentation from Dr. Rice dated 02/03/11 and including the most recent documentation from Dr. Morgan dated 04/25/11. There is no suicidal or homicidal intent or plan, delusions or hallucinations reported in the records. There is insufficient objective evidence to support significant impairments in activities of daily living as a result of psychiatric disorder. On a form dated 04/07/11, Dr. Morgan reported that Donna Lohr was able to perform activities of daily living, and in addition, on a form from Dr. Rice dated 02/03/11, Dr. Rice reported Donna Lohr is well groomed and able to perform activities of daily living. Based on review of the provided medical information, the employee is not disabled from her regular unrestricted job as of 02/02/11 through return to work.

(Id. at 114.)

After Dr. Givens's report, on or about July 14, 2011, Dr. Rupinder Kaur, a psychiatrist whom Ms. Lohr had seen previously in 2007, submitted documentation to Sedgwick regarding Ms. Lohr's June 30, 2011, appointment. (See id. at 120-31.) Dr. Kaur noted that Ms. Lohr's thought process and judgment were intact, that she was fully oriented, and that she did not suffer from hallucinations, delusions or suicidal or homicidal ideations, but described her appearance as disheveled, her motor activity as retarded, her affect as appropriate, sad, worrisome, labile and constricted, her mood as depressed and labile, and her speech as delayed. (Id. at 126-27.) Dr. Kaur marked "No impairment" with respect to impulse control, reasoning, and judgment, but marked both "Patient reports [impairment] but not observed" and "Patient reports [impairments] and observed" with respect to memory, concentration, motivation, ability to regulate and initiate activities, ability to perform well learned tasks, emotional regulation, and problem solving. (Id. at 127-28.) Dr. Kaur noted that "Patient reports [impairments] but not observed" with respect to ability to interact with

8

others. (Id. at 128.) Dr. Kaur noted Ms. Lohr's inability to perform "serial seven" tests[4] or spell "world" backwards. (Id.) Dr. Kaur further noted that Ms. Lohr needed to be redirected during the appointment and that she was "crying, tearful, distraught, distressed." (Id. at 127-28.) Dr. Kaur determined that Ms. Lohr was totally disabled until August 15, 2011, and provided an estimated return to work date of August 16, 2011. (Id. at 129.)

Dr. Givens reviewed the updated information from Dr. Kaur and spoke with Dr. Kaur on July 14, 2011. (Id. at 133.) Dr. Givens concluded that, based on this information, Ms. Lohr would be disabled from June 30, 2011, forward. (Id. at 134.) He explained:

> Additional information noted above in psychiatric synopsis and teleconference with Dr. Rupinder Kaur reported difficulty with serial sevens, and Dr. Rupinder Kaur reported psychomotor retardation. Reports that Donna Lohr can only do one-step of the serial sevens before making mistakes regarding going from 100 to 93, then make mistakes after that. Reports feeling hopeless and needed frequent redirection in session, isolating self and was reported to have disheveled appearance. In the teleconference above, it would appear that she was to engage in occupational duties requiring sustained concentration, social interaction and adaption but Dr. Kaur had not seen Donna Lohr since August 2007 until he saw her again on 06/30/11. As a result, the additional information changes my opinion starting from 06/30/11 forward regarding when the information supports inability to perform occupational duties.

(Id.)

However, on August 23, 2011, Sedgwick notified Ms. Lohr that, "[a]fter a thorough review of all the information that has been submitted, it has been determined to uphold the denial of benefits from February 2, 2011." (Id. at 144.) Sedgwick agreed with Dr. Givens that the additional medical information from Dr. Kaur supported Ms. Lohr's inability to perform

---

[4] A "serial seven" test is "[a] test for mental function, where a patient is asked to count down from 100 by sevens." Scott v. Eaton Corp. Long Term Disability Plan, 454 F. App'x 154, 157 n.7 (4th Cir. 2011).

her regular unrestricted job, starting from June 30, 2011. (Id. at 146.) However, Sedgwick explained, under the terms of the Plans, STD Plan and LTD Plan coverage ends on the 90th day of leave. (Id. at 144.) Accordingly, although Dr. Givens determined that Ms. Lohr was disabled from June 30, 2011, forward, "this date is beyond the 90th day of her leave of absence" that began on February 2, 2011, and she was no longer eligible for STD or LTD benefits. (Id. at 146.)

On October 10, 2011, Ms. Lohr again sought "review and/or appeal of the prior denial of her [STD] benefits" based on "additional medical information" submitted by her physicians, (id. at 156), which appears to reference a September 6, 2011, letter from Dr. Kaur, (see id. at 154-55). On October 24, 2011, Sedgwick acknowledged receipt of Ms. Lohr's request for review and explained that the appeal is a closed file appeal in which only documents received during the initial claim review and the first appeal would be considered. (Id. at 161.)

On December 15, 2011,[5] Sedgwick informed Ms. Lohr by way of letter that "the [UnitedHealth Group] Appeals Committee has concluded that the . . . claim process [sic] were followed and that there is no basis to overturn the previous decisions." (Id. at 162.) This action followed.

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. See

---

[5] Although the letter, on its face, is dated December 15, 2012, that appears to be a typographical error. (Compare R. at 161 (setting response deadline of "12/15/2011") with id. at 162 (reflecting response date of "December 15, 2012").)

10

Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Holland, 487 F.3d at 213. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. See Anderson, 477 U.S. at 248. Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. See id. at 249. In essence, the analysis concerns "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The applicable standard of review by a district court of the denial of benefits under ERISA plans is well settled. If a plan administrator is granted discretionary authority to determine eligibility or to construe the terms of the plan, the denial of benefits must be reviewed for abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 115 (1989); Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). In this case, each Plan gives the Claims Administrator "the exclusive right and discretion, with respect to claims and appeals, to interpret the [P]lan's terms, to administer the [P]lan's benefits, to determine the applicable facts and to apply the [P]lan's terms to the facts." (Gov. Docs. at 144.) As such, the decision of the Claims Administrator - in this case, Sedgwick - is reviewed for abuse of discretion.[6]

---

[6] In Section III of Ms. Lohr's brief, she frames the relevant issue as whether (continued...)

11

The Fourth Circuit has explained the contours of the abuse of discretion standard in the ERISA context as follows:

> First, in ERISA cases, the standard equates to reasonableness: We will not disturb an ERISA administrator's discretionary decision if it is reasonable, and will reverse or remand if it is not. Second, the abuse of discretion standard is less deferential to administrators than an arbitrary and capricious standard would be; to be unreasonable is not so extreme as to be irrational. Third, an administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. Fourth, the decision must reflect careful attention to the language of the plan, as well as the requirements of ERISA itself.

Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (internal citations and quotations omitted) (4th Cir. 2008). In sum, the standard requires "administrators' decisions to adhere both to the text of ERISA and the plan to which they have contracted; to rest on good evidence and sound reasoning; and to result from a fair and searching process." Id. at 322-23.

A reviewing court may consider the following factors in determining whether an administrator has abused its discretion:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

---

[6](…continued)
"Defendant abuse[d] its discretion in denial of Plaintiff's benefits." (Doc. #31 at 2.) However, she entitles the first section of her Legal Argument, "Defendant arbitrarily and capriciously denied Plaintiff's benefits under the Plan." (Id.) She then states that "[t]he law is undisputed that the Court's review of these matters is de novo, [sic] utilizing an abuse of discretion standard based on the whole record." (Id.) (citation omitted). It is unclear what standard Ms. Lohr is applying in her argument. Not only does she argue that United's decision-making process is arbitrary, but she also argues that United abused its discretion. (Id. at 3-4.)

Booth, 201 F.3d at 342-43.

III.

Based on the facts in the Administrative Record and the terms of the Governing Documents, United did not abuse its discretion when it denied Ms. Lohr's claims for STD benefits, and consequently for LTD benefits, despite her arguments to the contrary.  The Plans were clear that any Medically Determinable Impairment "must be established by Medical Evidence consisting of signs, symptoms and laboratory findings, and not only by the individual's statement of symptoms." (Gov. Docs. at 130.)  Prior to Dr. Kaur's report regarding his June 30, 2011, appointment with Ms. Lohr, the documentation in support of her claims lacked this objective medical evidence.  Not only did the documentation from Dr. Rice and Dr. Morgan fail to provide any indication of objective medical testing supporting the conclusions contained therein, but, with the exception of Dr. Morgan's observation during Ms. Lohr's March 30, 2011, appointment that Ms. Lohr was "[t]earful at times during interview," (R. at 97), it is unclear whether Dr. Rice and Dr. Morgan based their conclusions on anything other than Ms. Lohr's own reported symptoms. (See, e.g., id. at 52-53 (Dr. Rice noting her observations and patient's self-report of appearance, performance of ADLs, motor activity, affect, mood, speech, though process, hallucinations, delusions, orientation, judgment, at-risk behavior) & 55 (noting that "Client has conceptualized the following areas as barriers in returning to work: Increase in work demands, Conflicts with supervisor, Anticipation of relapse, [and] Recent unfavorable work evaluation . . .").)

It was not until Dr. Kaur's July 2011 report that Sedgwick was in possession of medical documentation adequately supporting Ms. Lohr's claim of disability. (See id. at 126-29.) Accordingly, United's conclusion that Ms. Lohr was not disabled prior to June 30, 2011, was reasonable. See Messer v. Prudential Ins. Co. of Am., No. 1:11-cv-00090-MR-DLH, 2013 WL 1319391, at *9 (W.D.N.C. Mar. 29, 2013) (unpublished) ("Because Plaintiff failed to submit any objective evidence demonstrating any impairing functional limitations resulting from his psychiatric conditions, Prudential properly concluded that the medical evidence of record does not support a finding that Plaintiff is precluded from performing the material and substantial duties of his regular occupation due to psychiatric symptoms."). Furthermore, because that objective medical information did not support Ms. Lohr's disability until after her coverage lapsed under the Plans, United's decision to deny benefits was reasonable, as well. (See id. at 144-46; Gov. Docs. at 100, 110.)

Ms. Lohr contends that "[t]he medical evidence beginning on January 31, 2011 with Dr. Rice identifies Plaintiff's thought and speech limitations as a direct result of her medical conditions" and cites pages 30-37 of the Settled Administrative Record for that assertion. (Doc. #31 at 2.) However, although Dr. Rice did indicate that Ms. Lohr's speech was "delayed," she described Ms. Lohr's thought process as "intact." (R. at 34.) Ms. Lohr goes on to assert that "Dr. Rice did conduct objective tests of Plaintiff's abilities as noted in the above referenced reports," but fails to indicate what portion of Dr. Rice's reports would support that conclusion, and there is nothing evident in those documents that would suggest she performed objective tests. Indeed, Ms. Lohr's argument is somewhat in tension with her

14

subsequent statement that the conditions from which she suffers "are not subject to technical, objective testing equipment in the same way that other medical conditions may be." (Doc. #31 at 3.)

Ms. Lohr also argues that "[d]eference should be given to the treating physician's assessment of a patient's condition." (Doc. #31 at 3.) Not only does she fail to offer any authority for this assertion, but, as United points out, both the Supreme Court and the Fourth Circuit have directly rejected similar contentions. See The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830 (2003) ("Nothing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a special heightened burden of explanation on administrators when they reject a treating physician's opinion."); Spry v. Eaton Corp. Long Term Disability Plan, 326 F. App'x 674, 679 (4th Cir. 2009) (unpublished) ("[T]here was nothing inherently unreasonable in the decision not to adopt the opinions of [the plaintiff's] primary care physicians.").

Ms. Lohr also contends that Dr. Givens's review was flawed because he "did not address all aspects of the Plaintiff's examinations by Drs. Rice and Morgan" in that his "finding that there was no objective medical evidence supporting Plaintiff's claims for short term disability benefits for the period from February 2, 2011 through June 30, 2011 failed to review the entire record from Plaintiff's medical providers." (Doc. #31 at 3.) Ms. Lohr, however, offers no details regarding which aspects of her examinations or which portions of her records she believes Dr. Givens failed to review, (see id.), and it is not apparent from the record that Dr. Givens's conclusions

15

were based on anything other than a complete review of Ms. Lohr's relevant medical documentation, (see R. at 113-14).

Finally, although Ms. Lohr contends that "Dr. Givens['s] changing his opinion of Plaintiff's disability simply because another psychiatrist like himself opined that Plaintiff was disabled" is indicative of "[t]he arbitrary nature of [] Defendant's decision process" (Doc. #31 at 3), it was not until Dr. Kaur's report that Dr. Givens had documentation of the observable symptoms and objective data required by the Plans to support a finding of disability. If anything, Dr. Givens's decision to amend his previous conclusion in light of updated information that supported Ms. Lohr's disability suggests United's "deliberate, principled reasoning process," Evans, 514 F.3d at 322-23, in determining the merits of Ms. Lohr's claims and supports a finding that United's prior finding of no disability was not unreasonable.

In sum, United's decisions that Ms. Lohr was not disabled earlier than June 30, 2011, and that, as of that date, her disability coverage had expired were reasonable and no basis exists to conclude that United abused its discretion in denying Ms. Lohr's claims for STD benefits, and consequently for LTD benefits.[7]

IV.

For the reasons stated above, Defendant's Motion for Judgment on the Administrative Record (Doc. #27) is GRANTED, and, because no other

---

[7] Given this conclusion, there is no need to address Ms. Lohr's request for attorneys' fees and costs. See Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 243 (2010).

causes of action remain, the instant action is DISMISSED WITH PREJUDICE.

This the 10th day of July, 2015.


                              /s/ N. Carlton Tilley, Jr.
                         Senior United States District Judge